ORIGINAL
FILED
JUN - 5 2018
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

The Offices of Benjamin PD Cannon
4104 24th st #403
San Francisco, CA 94114
707.235.8663
ben@6by7.net

**IN THE UNITED STATED DISTRICT COURT**

**NORTHERN DISTRICT - CALIFORNIA**

BENJAMIN PD CANNON,

Plaintiff,

v

DIANA GOMEZ, COUNTY OF SONOMA, TYRA HARRINGTON, and DOES 1 through 30, inclusive

Defendants.

CASE NO. CV 18 3328

**VERIFIED COMPLAINT FOR DAMAGES FOR VIOLATIONS OF CIVIL RIGHTS, PROPOSED TEMPORARY ORDER.**

MEJ

**DEMAND FOR JURY TRIAL**

Judge:

**Jurisdiction and Venue**

1. This case arises under 42 U.S.C. § 1983. Accordingly, subject matter jurisdiction is conferred upon this Court by 28 USC §§ 1331F and 1343. And for a Federal Question.

2. Plaintiffs' claims arise out of conduct and events that took place in the State of California, which is within this judicial district.

3. The amount in controversy exceeds $1million.

**The Parties**

**Plaintiffs**

1. Plaintiff Benjamin PD Cannon is a member of the American Society of Civil

Engineers, a resident of San Francisco and Sonoma County, and an adult over the age of 18 qualified to bring suit on his own behalf.

2. Mr. Cannon is a member of the American Society of Civil Engineers, an engineering construction trade organization.

3. Mr. Cannon is also a former General Engineering Contractor, General Building Contractor, and specialty C-20 Mechanical Contractor. Although now retired, Mr. Cannon retains extensive knowledge of the building code and was for many years duly licensed by the State of California to construct any structure or engineered improvement, including nuclear power plants and airports under CA License #884900.

4. Mr. Cannon is also a former DoD Contractor, and has flown extensively with the UNITED STATES ARMY, NIGHT VISION LABAROTORY, and has passed an Army Flight Physical. Mr. Cannon was directly involved in numerous federal programs related to giving our troops enhanced battlefield situational awareness, including MQ-1 Predator, MQ-9 Reaper, Predator Digital Upgrade, Predator Designator, ASTAMIDS (a bipartisan multi-contractor program that successfully targeted, identified, and geo-tagged buried antipersonnel land mines, facilitating their eradication from this earth) Global Hawk, and even programs involving the B2-Spirit.

5. In the early 2000s, Mr. Cannon applied for his Top Secret Clearance.

6. Mr. Cannon is also an expert in computer forensics and has provided expert investigatory assistance to numerous litigation matters before this and other courts.

7. Mr. Cannon holds 3 patents, has Founded or Co-Founded 3 nonprofit public benefit corporations; The Calguns Foundation, a legal defense and education fund; SF ASPIRE, an education and scholarship outreach program to benefit children and single mothers by helping those already enrolled in college secure graduation and a degree; and Gun Safe America, dedicated to improving safe storage of dangerous weapons nationwide.

8. Mr. Cannon has over 20 years of public advocacy experience, and has helped shape

public policy in a more just and verdant manner.

**Defendants**

1. Defendant Diana Gomez is a disgraced former elite homicide prosecutor, who until 2015 ran the County's entire Homicide division. She is currently working County Counsel on code enforcement matters.

2. Defendant County of Sonoma (County) is a political subdivision of the State of California. Diana Gomez is a County Counsel employed by the County. Gomez is sued both in her individual and official capacities.

3. Defendant Tyra Harrington is a former Police Officer who is now working county code enforcement cases. She works under the "Permit and Resource Management Division" (PRMD) of Sonoma County, this is the entity that issues building permits within their unincorporated jurisdiction.

4. The Doe defendants are currently unknown, or if known, their conduct has yet to be exposed in an actionable form. They will be identified through the discovery process.

5. At all material times, each Defendant conspired with each other Defendant to violate Plaintiff's rights, as described below, resulting in deprivation of Plaintiffs' constitutional rights and other harms, as alleged below.

6. Each individually named defendant and each co-defendant acted under color of law and within the scope of his or her agency and employment with the County, the State, or some other local agency.

**Exhibits**

7. All exhibits attached are hereby incorporated as though individually set forth herein.

**Procedural history**

1. The County filed an action against Cannon on October 20, 2016 ( a copy thereof is attached and incorporated), and also filed a Temporary Restraining Order (also attached

and incorporated). The TRO was granted, and Mr. Cannon's "RV Resort" in the form of a "tiny house village" (RV Resort) was shut down the next morning when government agents including HARRINGTON raided it, ejecting paying guests who had come up for the weekend to wine taste literally as their limousine picked them up.

2. The order directed Mr. Cannon to obtain permits for alleged violations. Mr. Cannon immediately drafted those permits, and in November 2016 presented them to PRMD for submittal.

3. HARRINGTON intercepted Mr. Cannon, and physically prevented him from filing his permit applications.

4. The parties entered into a stipulated Settlement on Feb 26, 2018. It was agreed that Mr. Cannon would obtain a grading permit and pay some fines by March 15, 2018.

5. On Feb 20, 2018, Gomez filed a document stating she is seeking over $1.2million dollars in fines alone, which would set a record as the most extreme and punitive fine ever assessed by Sonoma County in it's 168 year history.

6. Diana Gomez on Friday March 2, at 2:50pm sent Mr. Cannon a brief, terse, alarming, and deficient notice that she would be pursuing "OSC re contempt" but not the reasons for it, or the moving papers, which by law have to be served on him no later than 10AM the last business day before they are submitted to the court. This is to give the other party opportunity to review and respond to any allegations.

7. **<u>This is the Third time that Ms. Gomez has abused the ex-parte process</u>** by giving insufficient or no notice and by eschewing mandatory meet and confer requirements set by the Court for good reasons.

8. Mr. Cannon has not been served with any moving papers, and has not had the opportunity to prepare any response, nor has he been so much as told what Gomez is seeking or why.

9. In addition, Ms. Gomez is required to "meet and confer" with Mr. Cannon before filing an action like this.

10. Ms. Gomez has not.

11. Mr. Cannon has asked for an extension of time so that he can prepare these additional Permit, Use Permit, and Zone Change applications, which will resolve 100% of any allegations, however Gomez has refused, instead insisting on rushing to trial on a building code matter that is curable by a building and other permits.

## The Relevant Facts

1. Around 2004, Mr. Cannon's parents bought a property at 4885 Mill Creek Road in Healdsburg, CA. That property is 51.88 acres in size, and housed a campground with a man-made pond dating back to the turn of the century, a tapped spring for drinking water, a kitchen with fridge, sink, and food preparation and serving tables for approx. 20-30 people, a functional Outhouse with Cistern for sewage disposal, as well as several RVs of various state, and a 1923 Petaluma-Santa Rosa Railroad box car, converted to around 12 sleeping berths for the campground.

2. The Campground also has a 200A 3-phase power service installed with a County permit in 1984.

3. The Campground has phone lines serving it from AT&T.

4. The Campground also has a well put in place in 1990, and developed springs dating back to the 1900s, one with a state water board permit.

5. All permits are hereby subject to an RJN.

6. In 2010 or 2011 or so, Mr. Cannon walked into PRMD and asked to speak to someone about modernizing this campground.

7. The property also has a separate single family dwelling built in 1970 with building permits and separate electrical, septic, and phone service.

**County's coordinated Actions to deny Mr. Cannon his rights**

8. In 2014, the Director of the Sonoma County PRMD Permit office was given the immense power of directly initiating litigation without County Board of Supervisors vote or oversight.

9. Accordingly, a major check to government power was obliterated.

10. PRMD Director Tennis Wick is now the single and sole controlling entity deciding when to utilize the "nuclear" button of litigation.

11. Wick and PRMD wasted no time, and promptly began suing property owners for insignificant violations.

12. Many times, County Code Enforcement would not wait for a complaint to come in, as they are required by law to do, but instead initiate fraudulent complaints on their own. They have done this many times before.

13. They are left free to do this because the identity of a complainant is typically kept Confidential, and indeed the County in this case has Redacted all records of complaints, even in Discovery, even when the identity of the complainant has been demanded.

14. Spurred on by their new money-making venture, and able to assess Attorney Fees in addition to "Staff Time" at an aggressively inflated rate of over $100/hour for employees paid less than $100,000 a year.

15. These fees and "staff time" are a cash-cow for the County, which is struggling and may be declared insolvent as a result of the recent Sonoma Wildfires which devastated the County and burned over 10% of all land and structures. Since the County cannot collect property tax revenue from burned out properties, it is panicked and desperate for any source of income.

16. Desperate for new income, the County revived a then 2-year old frivolous septic complaint from a former tenant that Mr. Cannon had to evict from his property.

17. In 2014, the County began hiring 8 new Code Enforcement officers to penalize Cannabis cultivators. Left with nothing to do until at the time 2016, the effective date of the County's new Cannabis ordinances, the new Code Enforcement staff was

instructed to "find work".

18. In 2015, The County re-opened the file, and the newly hired Code Enforcement officer, a former Oregon Sherriff's Deputy, Tyra Harrington, re-initiated an already closed investigation, demanding a site-visit.

19. Mr. Cannon responded by immediately hiring Rene DeMonchy of "Homeworks Consulting", who was endorsed by PRMD itself as a member of their "advisory board", in order to obtain whatever permits were needed to satiate the County.

20. I instructed Mr. DeMonchy to prepare a Use Permit if needed.

21. On or about Sept 20, 2016, Mr. DeMonchy escorted PRMD staff onto the property via the paved driveway where they of course verified that no septic leak was present.

22. Instead of leaving, PRMD staff drove out of the Home's paved driveway, drove 1000' down Mill Creek Road, and entered another driveway and entered through a locked gate to illegally inspect the Campground.

23. PRMD staff left and did not contact Mr. DeMonchy or Mr. Cannon for almost a month.

24. On Oct 19 2016, the Gomez e-mailed Mr. Cannon and indicated that "tomorrow morning" she was going to file "A restraining order" against him. Confused, Mr. Cannon contacted Gomez and informed her of the legal-nonconforming nature of the campground, the prior PRMD office visits, and sent her numerous pictures of documentation showing the age of the campground.

25. It should be noted that Mr. Cannon has retained numerous experts and consultants and engineers to prepare plan submittals, and that some of those submittals are still in progress largely due to the County's obfuscation of the requirements to those professionals.

26. In-fact, Mr. Cannon is informed and believes, and thereon alleges, that County PRMD staff have deliberately attempted to get Mr. Cannon's consultants to quit the project by inflating and at times inventing outright false liability concerns. All of these

actions were undertaken with fraud oppression and malice.

27. Ms. Gomez ignored all of these disclosures and permits she was unaware of, and pressed forward with her litigation and the court granted her a restraining order based on her and HARRINGTON's perjury on Oct 20, 2016.

28. On October 21, 2016, agents from the County of Sonoma including HARRINGTON raided Mr. Cannon's property and ejected his paying guests out of their warm tiny house as their limousine arrived to take them wine tasting, a common pastime of Mr. Cannon's resort guests.

29. Under duress, but compelled by court order, Mr. Cannon also immediately disconnected the Tiny House units that same day from all utilities.

30. Mr. Cannon reviewed the documents after the fact, and determined that HARRINGTON and GOMEZ had acted together to perjure themselves by swearing in a Declaration signed under Penalty of Perjury that Mr. Cannon had created a serious and emergency threat to life-safety by illegally tapping into PG&E overhead wires, and that "no PG&E meter protected the lines".

31. There is only one problem with this. The 3phase 200A campground service was installed in 1984 with Permit number B-016715.

32. Subsequently, in discovery, we obtained a photo that HARRINGTON took of the PG&E meter on the same day of her inspection that led to her declaration it did not exist. Based on the angles in the photo, it appears HARRINGTON was standing approximately three feet from the dinner-plate sized commercial 3-phase PG&E meter, which is at eve level and is not concealed by any covers or structures.

33. Subsequently in 1990 a well permit no: 226-90 was installed at the campground to supplement the spring water sources. The 1990 Well Permit's partial Site Plan clearly shows at least 2 "Camp Trailers" in the nearby vicinity of the well.

34. When Mr. Cannon came in to get permits, he was told by Harrington that "we can't find any permits on your property, your house is illegal, here's a nonconforming

determination zoning permit application" and sent him home.

35. Confused, Mr. Cannon obtained his home's 1970 building permit from the records desk, less than 30 feet from HARRINGTON's own desk, and presented them on a subsequent visit. "Oh, I guess it's legal" was all she said. It was trivial for Mr. Cannon to search the old APN and address files after a 1971 minor lot split.

36. Mr. Cannon determined that HARRINGTON was also wrong about sewage, and he located the 2006 septic permit, which HARRINGTON told him was for his house, because his house had no permit. Mr. Cannon showed HARRINGTON the separate septic box permit (which was Code at the time) on his 1970 Home permit.

37. On or about Nov 20, 2016, Mr. Cannon came into PRMD with completed Septic, Electrical, and Building permits to PRMD headquarters and attempted to submit them. Each separate department was ready to issue the permits, but. Mr Cannon was intercepted by HARRINGTON who said "We're not taking any permits from you". Mr. Cannon explained to HARRINGTON that he was ordered by the court to obtain these permits, that he is here in good faith to file them, that they had already been reviewed by Christine Camerelli at the permit desk and she had written "OK TO ISSUE" and that she was obstructing a court order.

38. HARRINGTON didn't care, and ejected Mr. Cannon from PRMD. (see Dec of Benjamin Cannon detailing efforts to obtain permits, attached and incorporated.)

39. Over the next year, Mr. Cannon would hire 3 Lawyers, and after the tragic death of Mr. DeMonchy, 3 Permit-Consultants, 2 Civil Engineering firms, 2 Engineering Construction firms, and separately retain half a dozen Storm water, Erosion, Septic, Biotic, Archeological, Hydro-Geological, and Grading consultants, engineers, and professionals.

40. Mr. Cannon has spent well over $100,000 in "fixing" the alleged violations on his property, however County keep re-interpreting or re-inventing new violations to deliberately prevent his compliance.

41. For instance, they recently took Mr. Cannon to OSC calendar over Erosion Control. Mr. Cannon spent tens of thousands of dollars preparing erosion control plans, at the request of the County. Mr. Cannon had his **attorney**, Erin Carlstrom of DP&F, submit the erosion control plan, and his building and electrical plans, to the County. They have refused to so much as review them, much less approve them.

42. Refusing to approve erosion control, and simultaneously threatening him with money sanctions for not putting it in, Mr. Cannon went out and hired Always Engineering, and CrosbyTave Consultants to prepare erosion control plans anyway.

43. Mr. Cannon hired NESCO construction, who stabilized the site and provided bag dams, silt fences, wattles, hydro seeding and $5000 worth of erosion control work . He further hired Licensed Engineering Contractor McCusky Engineering for $35,000, who at Mr. Cannon's request placed more substantial additional erosion control, wattles, bag dams, check dams, wattle dissipaters, stream dissipaters, rip-rap protection, seeding, and created a silt "detention pond" to trap any runoff, though we did not know the County's areas of concern and still do not because they will not approve plans.

44. Mr. Cannon spent in total almost $40,000 on contractors alone and another $22,000 on engineering fees, all for erosion control.

**Campground Use**

45. Mr. Cannon contends correctly that what he has come to realize is a legal-nonconforming "RV Resort Campground" on his parcel, zoned "TP" or "Timberland Production" with the principal use being the commercial harvesting of timber.

46. It should be noted that PRMD staffers constantly incorrectly refer to this zoning as "Timber Preserve" which connotes very different use. This is false.

47. Mr. Cannon has no desire to commercially log the gorgeous old redwood trees on his property situated less than 4 air miles from Armstrong Redwoods State Park.

48. Mr. Cannon's property at only 51.88 is unsuitable and financially unviable in 2018

for commercial timber harvesting, it would never turn a profit.

49. Out of a total of 7 neighbors of Mr. Cannon's estate, 5 are zoned RRD already. The Sonoma County General Plan Land Use policy for Mr. Cannon's property is RRD.

50. Combined with his westerly neighbor who is also seeking a zone change to RRD, (which will make 6 of 7 properties RRD) Mr. Cannon's property forms a 100 acre "Island" of TP surrounded on all 3 sides by RRD, and on the 4th side, by Mill Creek Road, and then a single TP parcel.

51. Mr. Cannon's campground use dates continuously back to the early 1900s, and he has already prepared a 20+ page investigation report of his own to attest to this, which the County continues to actively ignore or refuse to look at at all.

52. Mr Cannon is actively engaged an Archeologist to more thoroughly document this since the County is engaged in such illegal opposition to the point of refusing to even examine a permit application for Legal Nonconforming Determination.

53. Mr. Cannon's property is presently zoned as permitted for "Camping, with or without a fee" as a Permitted Use requiring no further authority.

54. Mr. Cannon's property is presently zoned as permitted for "Permanently improved Camps, resorts"

55. Mr. Cannon is seeking a re-zone to RRD which allows in addition to 30-unit RV Parks and Camps with a Use Permit, also Vacation Rentals.

56. Mr. Cannon seeks to submit this Use Permit and Zone Change as a combination application, a practice commonplace in land development, and furthermore commonly used in Sonoma County to resolve alleged code violations.

57. Diana Gomez at first insisted that no permits of any kind could cure a Tiny House resort on a property zoned for Resorts…

58. Dean Parsons, director of PRMD project review, at first insisted to me that "no permits" can be issued for an RV Resort, and that no RV Resorts existed in Sonoma County.

59. Mr. Cannon looked up AUTOCAMP Guerneville, which is an RV Resort that exists in Sonoma County. I asked Mr. Parsons and Ms. Gomez if they were familiar with it. Both said "No."

60. Mr. Cannon Obtained from the public file, e-mails between Dean Parsons and the owners of AUTOCAMP regarding their Use Permit for RV Resort, dated less than 2 years previously.

61. Mr. Cannon is informed and believes, and thereon alleges, that Gomez and Parsons both knowingly and deliberately misled Mr. Cannon in effort to convince him to settle with the county for hundreds of thousands of dollars in back-fines for "incurable" offenses which were in-fact, easily curable by means Mr. Cannon had already exercised.

62. Mr. Cannon has done nothing but bend over backwards, spending nearly a quarter million dollars in attempts to comply with what has become an ever-moving target the County deliberately obscures.

63. When Mr. Cannon asked Diana Gomez what violations remained on his property as far as she was concerned, after she hysterically told him "YOUR POWER POLE IS ILLEGAL!" and "YOU WERE SIPHONING OUT OF THE CREEK!" (it should be noted that both of these allegations are categorically falsifications.)

64. Instead of giving Mr. Cannon a clear and concise accounting of violations that had not yet been cured, Gomez simply glibbed "I cannot give you legal advice".

65. On February 23, 2018, Gomez gave Mr. Cannon legal advice after he stated that PRMD officers had perjured themselves. She advised him to "Be careful… those are libelous statements".

**Use Permit**

66. Mr. Cannon's contention is that his park is Legal-Nonconforming, by virtue of being in existence continuously since the early 1900s, long before any zoning or

building codes.

67. However, he has decided to compromise with the County and obtain a Use Permit to Expand a Legal Nonconforming RV Resort, to cultivate Cannabis according to local County and State requirements, and to construct a 20,000 case winery, as well as a combination and required re-zone to

68. This combined Use Permit and Zone Change is required to legalize the Cannabis use due to County-initiated changes in law in 2016, where they arbitrarily and capriciously decided to allow Cannabis in the RRD zone, but exclude it from TP zone. Both the RRD and TP Zone share the RRD Land Use General Plan Designation.

69. Indeed, the County of Sonoma outlines a written procedure on their website at: https://sonomacounty.ca.gov/PRMD/Instructions-and-Forms/Use-Permits/

Which reads in pertinent part "A Use Permit application is required for development projects that are typically more intensive than Permitted Uses. Use Permit applications often require a public hearing before the Board of Zoning Adjustments; **when processed with a Zone Change** and/or a General Plan Amendment, the **public hearing will be before the Planning Commission.** (emphasis added)

70. As one can clearly see, the County has a written policy for accepting and acting on combined Zone Change and Use Permit applications, indeed we found half a dozen examples of actual cases of Zone Change and Use Permits in the County of Sonoma with a simple Google search.

71. Since the property is already designated in the General Plan for RRD Land Use, no General Plan Amendment is required. However, the hearing (after all agency comments) will still be before the Planning Commission.

72. On May 29, 2018, Mr. Cannon walked into PRMD offices once more, and informed the desk clerk that he would like to Submit a Use Permit and Zone Change packet as drawn by his AIA licensed Architect and State licensed Civil Engineer.

73. The full submittals are substantial, are not reviewed "Over the Counter" and instead are taken-in in a documented procedure, and are later reviewed and any deficiencies or areas of explanation required are "commented" in writing. A total of 18 different

State, Federal, and Local agencies provide comment, questions, enhancements, and requirements - Then the UP will eventually be voted on approx. 1-2 years later.

74. After waiting over an hour despite no one else in line, Mr. Cannon was finally called to the planning desk, he was told by "Cynthia" - who would not give her last name, email, or phone number, but insisted she was a "Planner" who "Had been doing this for twenty years" – that the County does not process Zone Changes and Use Permits together, and that he must wait 10 years before submitting a Use Permit.

75. Obviously that is false, and Mr. Cannon countered that he had been involved with development projects that have had both Use Permits and Zone Changes submitted contemporaneously.

76. Mr. Cannon also pointed out that at least the RV Resort use is allowed in both RRD and TP zones.

77. "Cynthia" then looked to see if an RV Resort was allowed in the TP zone, and was unable to read the Zoning Code on her computer.

78. Katie Olding, Planner 1 came over at this time, and said "OH NO, we're not taking any Cannabis permits!" but then took over "Cynthia's" computer, and opened the Zoning Code, which neither of them were familiar, and found that an RV Resort is a an allowed use in both TP and RRD. Katie appeared to be "Cynthia's" boss.

79. Both employees however refused to even examine the Use Permit, and instead handed it back to me and said "we won't take this" and when I asked for a written denial or grounds for a denial, they were silent.

80. I left, and called my Architect and Engineer, who, flabbergasted, asked me to go back in and submit the permit.

81. At this time, Tyra Harrington and Dan Cahill from Code Enforcement were present.

82. When I asked them to take the permit on the second visit, after learning that the County does exactly this, I was told "Oh, it's because it's you, we've told you no 4 times now".

83. When I pressed again, saying "Can you explain to me why the County has a policy for voting on this at the Planning Commission, when you're telling me it you won't do it?" she said nothing.

84. I then called my AIA licensed architect, and State of California Licensed Engineer, at which time PRMD staff actually refused to communicate with them. In twenty years of professional real estate experience, I have never encountered such treatment.

85. Then the four of them physically moved to encircle me, and I left. I am nothing short of aghast as to the treatment I received at the hands of PRMD staff.

86. A further detailing of the multiple refusals of PRMD to follow the law are included in a subsequent declaration.

87. Preparing for an emergency order, I called Deputy County Counsel Michael King, and asked him if his Client was still going to refuse to even look at any permits I bring in.

88. He asked me to "Send him the Use Permit" which I agreed to do and did in-fact do within the hour.

89. I also sent a letter (attached as **Exhibit A**) to County Counsel Michael King, and included the attached Use Permit Submittals (**Exhibit B**, very large.)

90. This was my efforts to Meet and Confer as required by the FRCP and Local Rules.

91. Mr. King responded to me and only said "Dean Parsons will be in touch with you" Mr. Parsons has not spoken with me, but did leave a general voicemail telling me that a Use Permit needs a General Plan amendment. He clearly has not reviewed my application, because I still have it, since PRMD refused to look at it. He is also clearly not even aware of the property's address let alone it's zoning or general plan designation, and he has yet to return any of my subsequent calls.

92. The County remains firm in its refusal to even examine any permit application I bring in.

93. Both my AIA Licensed Architect and State of California Licensed Civil Engineer

have written letters (**Exhibits C** and **D**) stating that the submittals they have prepared are sufficient to be taken in and examined by any municipality.

**Argument**

94. Diana Gomez, Tyra Harrington, and The County of Sonoma as an institution conspired together to commit perjury in order to secure an enforcement injunction against Mr. Cannon, in a coordinated effort to shut down his only means of income and prevent him from accessing the courts to defend himself.

95. Indeed, the County has nearly succeeded as in the last year and a half, Mr. Cannon has sunk nearly every dime he has into compliance efforts, while the county actively engages in what amounts to institutionally deliberate Obfuscation.

96. The County has outright refused to accept permits that Mr. Cannon was ORDERED by the court to obtain. These permits were deemed "OK TO ISSUE" by the normal building department in PRMD.

97. The County further attempted to prosecute Mr. Cannon in or about 2006 for being a "Police impersonator" because they didn't like that Mr. Cannon had perfectly legal amber LED strobes on his car from his work with the Department of Defense on active airstrips. Unfortunately for the County, Mr. Cannon wasn't even in Sonoma County on the day that the County invented, so the case was dismissed, and Mr. Cannon filed a 1983 civil rights action in this same Court. Mr. Cannon's case largely prevailed and survived a 12(b)(6) motion to dismiss, a high bar for a civil rights action.

98. The County bears ill will towards Cannon due to his suit against them, and they are taking these actions in retaliation. Mr. Cannon cannot obtain a fair trial in Sonoma County.

99. The County has done both recoverable and irrecoverable damage to Mr. Cannon's business, has deliberately and knowingly and fraudulently misrepresented allegations,

violations, and stood in the way of compliance on purpose, in order to rack-up more fines all in the name of extricating more income for the General Fund.

100. They must be stopped, and their unclean hands must not be granted the equity they seek.

101. Mr. Cannon just wants to file his permits and enjoy his property in a responsible manner as allowed to him under law.

102. Furthermore, the zoning of his property as "TP" is illegal spot-zoning, one of the worst forms of land use discrimination "*Ross v. City of Yorba Linda (1991)*"

103. The General Plan for the property says it is supposed to be RRD, and since it is between a 50 acre parcel and 4 10 acre parcels, it should be RRD 20 or RRD 25.

104. The property for this purpose is surrounded on 3 sides by RRD, and on the 4th by Mill Creek Road. It is irrational, arbitrary, and capricious to have an "island" of TP in a sea of RRD.

105. Illegal spot zoning creates a "class of one" Village of Willowbrook v. Olech, 528 U.S. 562 (2000)

106. The PRMD director should not only process our zone change, they should process it immediately, *sua sponte,* and charge no fees.

107. They should then accept a $700 Vacation Rental Permit, a Legal Nonconforming Zoning Permit for campground, address any remaining physical violations if any, and close their files and allow Mr. Cannon to proceed with his vineyards projects.

108. The County of Sonoma illegally shut down Mr. Cannon's uses on his property, including without limitation his RV Resort in the form of a tiny house village, they should pay the resulting loss of income.

109. Finally, the County refuses to take-in a Use Permit application that unilaterally and unarguably resolves any alleged 'violations' on the property, and they are statutorily required to do so.

110. The County does not have discretion to refuse to examine a permit application.

They must provide a written approval, comment, or denial, and must provide an administrative remedy for appeal.

111. They do not have to approve every permit, they have discretion for the appropriate board to vote to approve or deny, but they may not refuse to exercise that discretion (cite) in refusing to even look at a permit application.

**Causes of action**

In all cases, conduct is ongoing and recurring.

**One - Illegal spot zoning**

By illegally attaching the "TP" zoning to Mr. Cannon's parcel, and refusing to remove it when requested, Defendants damaged Mr. Cannon in an amount to be proven at trial.

**Two - Due process violations under the 14th amendment.**

By failing to so much as read, let alone review and approve/deny, Mr. Cannon's permit applications, and by illegally and forcibly entering and abating Mr. Cannon's valid uses, defendants damaged Mr. Cannon in an amount to be proven at trial.

**Three - 4th amendment violations**

By entering illegally into Mr. Cannon's property, and kicking out his paying guests, County agents caused Mr. Cannon's business to fail, and caused damages in an amount to be proven at trial.

**Four - 8th amendment violations**

Defendants have lobbied a world-record fine for a few RV utility hookups of over $1.2million dollars. This, plus their punishment in shutting down his resort, violates his 8th amendment rights to free from cruel and unusual punishment, which we argue above, was for an allegation that was not in-fact a violation of any criminal or civil statute. As such Defendants caused damages in an amount to be proven at trial.

**Five – negligent misrepresentation**

Most of defendants' illegal conduct has been deliberate, carried out for all counts with fraud oppression and malice. However, some may be accidental. To the extent any of it was accidental, the representations including without limitation "No permits will cure this" when another part was approved by the same staffer 2 years prior, which Mr. Cannon initially relied upon, are at the least negligently misrepresented. As such Defendants caused damages in an amount to be proven at trial.

**Six – Perjury/Fraud**

Defendants' deliberately conspired together to defraud a judge into believing that there was no PG&E meter or switchgear protecting the power service to a rural resort in a wooded area. They did so together, deliberately, with fraud oppression and malice, in order to secure a legal remedy for an illegal desire (shutting Mr. Cannon's business down because they are angry at him for suing them in 2006).

**Seven – Intentional interference with perspective business advantage.**

By deliberately refusing to examine Mr. Cannon's permit applications, defendants deliberately interfered with Mr. Cannon's business, in a coordinated effort to harm him and deny him access to

the courts. That is presently without income and representing himself in this matter, is testament to their efficacy.

**Prayer**

Mr. Cannon prays for a verdict granting him general damages including without limitation damages from loss of use, loss of economic value, damages from civil rights violations, reliance damages, and asks that the court also impose punitive damages in amounts to be proven at trial but in excess of $1million.

Mr. Cannon also seeks reasonable attorney's fees, court costs, and fees.

Mr. Cannon also prays for injunctive relief in the form set out in the Proposed Order below, attached and incorporated herein.

VERIFICATION

I, **Benjamin Philip Diaz Cannon**, am a party to this action. The matters stated therein are true to my knowledge, except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed on ~~March 3, 2018~~ May 31 in San Francisco, California.

Benjamin Philip Diaz Cannon, *Plaintiff*